**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION AT COLUMBUS**

| | | |
|---|---|---|
| MARZETT HAWKINS, III, | : | Case No. 2:23-cv-1254 |
| | : | |
| Petitioner, | : | |
| | : | |
| | : | Judge Algenon L. Marbley |
| vs. | : | Magistrate Judge Kimberly A. Jolson |
| | : | |
| WARDEN, SOUTHEASTERN | : | |
| CORRECTIONAL INSTITUTION | : | |
| | : | |
| Respondent. | : | |

## REPORT AND RECOMMENDATIONS

Marzett Hawkins, III, a state prisoner proceeding with counsel, has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254.  The matter is before the Court to consider the Petition (ECF No. 1), the Return of Writ (ECF No. 9), Hawkins's Reply (ECF No. 16), and the state court record.  (ECF Nos. 8, 8-1, 8-2, 8-3, 8-4, 8-5, 8-6, 8-7, 8-8).  It is **RECOMMENDED** that this action be **DISMISSED**.

## I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The Court first considers the factual background and procedural history giving rise to Hawkins's petition.

### A.      Trial

On November 29, 2017, a Franklin County, Ohio grand jury indicted Hawkins on one count of aggravated murder under Ohio Rev. Code § 2903.0; two counts of murder under Ohio Rev. Code § 2903.02; felonious assault under Ohio Rev. Code § 2903.11; and two counts of having weapons while under disability under Ohio Rev. Code § 2923.13.  (ECF No. 8 at PageID# 29–33).  The charges were related to two drive-by shootings that occurred on November 12, 2017, causing

the death of "K.W." and injury to "R.C."[1]  (*Id.*).  Hawkins was tried by a jury and convicted on

June 20, 2019.  (ECF Nos. 8-1, 8-2, 8-3, 8-4, 8-5, 8-6, 8-7).

### B.    Direct Appeal

On August 19, 2019, Hawkins filed a notice of appeal to the Tenth District Court of

Appeals ("Court of Appeals") (*Id.* at PageID# 151).  Hawkins's brief raised the following

assignments of error:

(1) The verdicts were not supported by sufficient evidence and [Hawkins's] Crim.R. 29 Motion should have been granted.

(2) The jury's verdicts were against the manifest weight of the evidence.

(3) The trial court erred when it gave the jury a complicity instruction.

(4) The trial court erred when it allowed the State to reopen direct questioning of a witness.

(*Id.* at PageID# 157).

The Court of Appeals found that the following facts were adduced at trial:

A. Berkeley Road and Fulton Avenue Shooting

{¶5} On Sunday, November 12, 2017, shortly before 1:00 p.m., R.C. was shot in the hip while walking with his nephew near the intersection of Berkeley Road and Fulton Avenue. R.C. testified the shooter fired from a black vehicle displaying 30-day temporary tags. According to R.C., the individual yelled "Oh, is that R.C.?" and "Do you*** want some too?" before discharging the firearm. The shooter fled the scene in his vehicle driving toward Main Street. R.C. testified that the area is known for high gang activity and admitted he was a member of the Mound and Berkeley Bloods street gang. R.C. acknowledged that there was a conflict with the Easthaven Bloods when Buda-bang, an Easthaven Blood member, was killed at a nightclub.

{¶6} After the shooting, R.C. was transported by ambulance to Grant Medical Center. At the hospital, R.C. was unable to identify the shooter but described the individual as a light-skinned African American male with a beard and glasses. R.C. testified that a couple days after the shooting, he was shown a picture of [Hawkins]

---

[1]    The Tenth District Court of Appeals concealed the names of the victims and lay witnesses in its August 21, 2021, opinion. (ECF No. 8 at PageID# 248–257). For consistency, this opinion also refers to the names of the victims and the lay witnesses by their first and last initial.

2

from Instagram. R.C. stated that when he saw a picture of [Hawkins], "I knew exactly who it was." R.C. identified [Hawkins] in the courtroom as the individual that shot him on November 12, 2017.

{¶7} E.Y. testified to living in the area of Berkeley and Sycamore on November 12, 2017. According to E.Y., on the afternoon of November 12, 2017, he was driving to the carryout at Berkeley and Main Street when he saw an individual in a black vehicle shoot at two men walking down the sidewalk. E.Y. testified that the shots came from the left side of the vehicle before it sped away toward Main Street. "He didn't slow down a lick. He didn't hit his brake lights or nothing." E.Y. described the vehicle to law enforcement as a black car with 30-day temporary tags. On cross-examination, E.Y. stated that he did not know whether it was a male or female driver or whether multiple people were in the vehicle.

{¶8} Officer Jacob Champer of the Columbus Police Department ("CPD") testified to interviewing R.C. at the hospital on November 12, 2017. According to Champer, R.C. described the shooter as a light-skinned African American male that shouted R.C.'s name before discharging the firearm. Champer recounted that R.C. indicated that the shooter fled driving northbound toward Main Street.

B. 520 Lilley Avenue Shooting

{¶9} On the evening of November 12, 2017, an individual shot and killed K.W. while the decedent was walking back from a corner store near 520 Lilley Avenue.

{¶10} Officer Dianne Yandrich testified that she was dispatched to a shooting at 520 Lilley Avenue during her shift on November 12, 2017. According to Yandrich, upon arriving at the scene she initiated CPR on K.W. before the medics arrived but the victim was unresponsive. Yandrich testified that K.W. suffered gunshot wounds to his back, armpit, and his right side. Yandrich proceeded to work with the other officers to secure the scene. A security camera was recovered from the building located at 530 Lilley Avenue.

{¶11} Detective Lisa Swisher of the Crime Scene Search Unit testified that she was dispatched to a homicide at 420 Lilley Avenue on November 12, 2017. Swisher testified as to taking photographs of the victim on the sidewalk, collecting evidence, and preparing a crime scene sketch. Notably, two shell casings and a live bullet were collected near the victim. Swisher stated that she collected these items and secured them in the property room.

C. Investigation and Arrest

{¶12} The parties stipulated that law enforcement located security footage from 530 Lilley Avenue from the date and time of the incident. The parties also stipulated that on November 17, 2017, law enforcement was informed that [Hawkins] had recently purchased a black Hyundai with temporary tags, F277813. On November

3

20, 2017, law enforcement obtained a search warrant for Motorola and Verizon cell phones that were believed to have been the property of [Hawkins]. Law enforcement later obtained the purchase agreement and accompanying documentation for the Hyundai Elantra.

{¶13} AC. testified she lived in the area of Lilley Avenue, Fulton Street, and Berkeley Road in 2017. AC. stated that she was familiar with the Mound and Berkeley Bloods and was aware they had problems with other gangs at that time. According to AC., on or around noon on November 12, 2017, she was sitting on the porch on Lilley Avenue when a dark vehicle approached and asked if she was "from Mound and Berk," which she denied. AC. described the driver as a bald, light skinned African American male, with glasses and a beard. AC. testified that a few minutes after this interaction she heard "[s]hots."

{¶14} AC. further testified that during the evening of November 12, 2017, she went outside to collect some money after someone "ran off with $5.00." According to AC., she was walking on Lilley and Mound when she saw "the same car from earlier that day" pull up and shoot from the driver's window at an individual walking across the street with a bag. AC. saw sparks coming from the driver's window and heard six or seven shots. AC. stated she was unable to see into the car or how many people were in the vehicle. AC. confirmed that the vehicle in the surveillance video was the same one that pulled up to the front of her home that afternoon, and [Hawkins] was the same individual that spoke to her earlier in the day. AC. testified that she was interviewed by law enforcement and identified [Hawkins] in a photo array on November 21, 2017. AC. identified [Hawkins] in the courtroom as the driver of the dark vehicle on November 12, 2017.

{¶15} SWAT Sergeant Joseph Podolski testified that he was provided [Hawkins's] cell phone number and information about the purchase of a black Hyundai. Podolski stated that a court order was obtained to "ping" the number in order to locate [Hawkins]. According to Podolski, when CPD checked the location of the phone, they determined the black Hyundai Elantra was parked at the rear entrance of 1444 Forest St. Apt. D., but the vehicle did not have temporary tags. Podolski stated that the license plates displayed on the vehicle were registered to [Hawkins's] aunt, Abony Clark. SWAT surveilled the area and knocked on the apartment door. [Hawkins] was located inside the apartment and arrested.

{¶16} Podolski stated that after [Hawkins] was taken into custody, CPD discovered shell casings lodged in the front of the vehicle. Podolski testified "this one was unusual in the fact that it had shell casings that had been caught near the wiper blades there between the windshield and the hood of the vehicle." Podolski identified photographs of the vehicle, license plate, apartment, and shell casings. Podolski testified that the Hyundai Elantra was held until the crime scene search unit came out to process and impound the vehicle. Detective Donald Jones of the Crime Scene Search Unit also testified to taking photographs of the 1444 Forest St., Apt. D location, the vehicle, and casings found on the cowl panel of the

Hyundai. Jones stated that [Hawkins's] brown wallet and cell phone were discovered in the home, which were secured in the CPD property room.

{¶17} Detective Thomas Burton of the Crime Scene Search Unit testified as to the processing and search of [Hawkins's] vehicle. Burton stated that [Hawkins's] vehicle was impounded on November 19, 2017. Burton identified a series of 30 photographs taken of [Hawkins'] vehicle. According to Burton, a temporary license tag and clothing were discovered in the trunk of the vehicle. Burton also testified that [Hawkins's] social security card and traffic ticket were found in the glove compartment.

{¶18} C.W. testified that she lived with K.W. and her daughter at 528 Lilley Avenue in 2017. C.W. stated that K.W. was from Indianapolis and was not in a gang. According to C.W., on the evening of November 12, 2017, the decedent left the residence to get food at M & R market for dinner. C.W. heard several shots from the street and left the apartment. C.W. stated that law enforcement walked her back home and away from the crime scene. C.W. identified K.W. on the security video leaving their residence and walking towards the market.

{¶19} Richard Clark, the Site Administrator and Technician for Golf Tango Lane ("GTL") at Franklin County Corrections Center, testified as to how the inmate telephone system is maintained. According to Clark, inmates are given a unique identification number or PIN number, but inmates sometimes trade or use other PINs. Clark stated each call is recorded and every phone call tells the user that he or she is being recorded. Clark testified as to retrieving calls made by [Hawkins] and that the recordings are kept in the normal course of business.

{¶20} Jeffrey Brenner of the Ohio Organized Crime Investigation Commission was identified as an expert in the field of audio/visual forensics. Brenner stated that he received a copy of the security video that was hand-delivered by Detective Arthur Hughes on January 2, 2018. Brenner reviewed the video and determined it was unaltered. Brenner testified that the video showed brake lights and muzzle flash emanating from the driver's side of the vehicle.

{¶21} On cross-examination, Brenner acknowledged that he could not determine who was driving the car or if anyone else was inside the vehicle. Brenner also conceded that he was not able to get the license plate through the video or determine if the muzzle flash came from the front or back seat on the driver's side of the vehicle.

{¶22} P.L. testified that he worked with [Hawkins] at Condado Tacos in November 2017. According to P.L., law enforcement contacted him regarding the whereabouts of [Hawkins] on November 12, 2017. P.L. testified as to payroll procedure for Condado Tacos and that [Hawkins's] timecard for the date in question showed he arrived for work at 4:05 p.m. and left at 7:43 p.m.

{¶23} Brian Johnson of the CPD Homicide Crime Laboratory, an expert in the field of firearms, testified as to the firearms and casings in this case. Johnson stated that he will generally "receive a lab request with an evidence item so usually it's a firearm. It can also be the cartridge case, or cartridge cases, and bullets. I will be asked to test the operability or the functionality of a weapon that's recovered; and, periodically, I'm asked to associate cartridge cases to each other or to a weapon or bullets to each other or to a weapon." Johnson examined four shell casings to determine if they were fired from the same weapon. Johnson described the process of comparing shell casings and ultimately concluded the casings were fired from the same weapon. Johnson also testified that a firearm shot from the driver's side of a vehicle in that direction could eject casings on the window and land in the windshield area.

{¶24} Amber Gill, a Criminal Intelligence Analyst for CPD, testified as to records obtained from Facebook and the Bureau of Motor Vehicles ("BMV"). Gill stated that she assisted in the investigation looking into [Hawkins's] social media account and aided in filing CPD's request for records with Facebook. Gill testified to screen shots of [Hawkins's] Facebook post on November 15, 2017, that stated: "People showing they true colors everyday, but check digg I'm on some straight homicide shit so keep that fake love from round me." According to Gill, the post was later deleted from Facebook and there was no indication the account was hacked.

{¶25} Gill also testified that she obtained information from the BMV regarding the temporary tags on [Hawkins's] vehicle. According to Gill, [Hawkins] completed a power of attorney form and the BMV temporary tag registration application for the vehicle. Gill noted the signature at the bottom of the document indicated [Hawkins's] name and was dated September 15, 2017.

{¶26} Detective James Howe of the CPD Digital Forensics Unit, an expert in the fields of digital forensics and cell site analysis, testified regarding the processing of [Hawkins's] cell phones. Howe testified as to the general location of [Hawkins's] phone before and after the shootings. Howe concluded that [Hawkins] made no cell phone calls between 7:51 p.m. and 8:15 p.m. Howe testified that [Hawkins] did send outgoing messages on November 16, 2017, stating, "I'm one of Lucifer's death angels" and "We all have a debt to pay."

{¶27} Detective Arthur Hughes of CPD testified regarding several aspects of the investigation into the homicide of K.W. Hughes testified the November 12, 2017, video indicated that K.W. left his residence and was shot from the vehicle as evidenced by the muzzle flash emanating from the driver's side of the car. Hughes described the nature of K.W.'s injuries as two gunshot wounds to the right upper back area and one gunshot wound to the right side of the torso. According to Hughes, casings were recovered from the street and on [Hawkins's] vehicle. Hughes stated that it was later concluded the casings had come from the same weapon.

{¶28} Hughes stated that he prepared a photo array for AC. but that a blind administrator presented the photo array to the witness. AC. was able to identify [Hawkins] in position number five as the individual that shouted to her, "Y'all from Berk" from his vehicle. According to Hughes, the video of the vehicle going up 530 Lilley was consistent with AC.'s timeline of events. Hughes testified that, based on his investigation and experience, he is aware of problems between the Easthaven Bloods and the Mound and Berkeley Bloods which escalated after the killing of Buda-bang.

{¶29} Regarding [Hawkins's] jail calls, Hughes testified [Hawkins] made several incriminating statements including that [Hawkins] had to "figure out who * * * used the car" and asking D.C. to "deactivate" and "scrub" his phone and Facebook pages for anything incriminating. On cross-examination, Hughes conceded that he could not tell from the video who was driving the vehicle or how many people were in the car.

{¶30} Officer Anthony Johnson, formerly a detective with the Criminal Information Unit, or Gang Unit, from 2008-2015, was recognized as an expert in the field of identification of criminal street gangs. Johnson testified that certain criterion must be met to be a documented gang member such as association or committing criminal activity with other known gang members, tattoos or branding, self-admission, and reliable information from an informant. According to Johnson, the Easthaven Bloods have documented gang activity since 2004 with approximately 38 documented members. Johnson described the impetus of the dispute between the Easthaven Bloods and the Mound and Berkeley Bloods: "It was a rap concert. At some point, they left the concert. There was a couple shootings, and it turned into a bunch of Easthaven guys and MOB guys shooting back and forth at each other. They had one killed***. It was very—very volleyed, multiple gun shots, multiple guns being shot inside the club there."

{¶31} According to Johnson, [Hawkins] has been a documented member of the Easthaven Bloods since 2008. Johnson testified [Hawkins] admitted being an active member of the Easthaven Bloods in 2015. Johnson also stated [Hawkins] has gang tattoos and had a known affiliation with another member with a gun, in a vehicle, in April 2016. Johnson also testified as to [Hawkins's] recorded statements threatening a Mound and Berkeley Blood member, different gang member interactions, and revenge for Buda-bang's death. [Hawkins] stated "Nobody dropped. As soon as I get involved in it—as soon as I get involved in it, you seen what happened. You seen—once I get to calling the shots, you seen what happened, man." Based on these factors, Johnson concluded that [Hawkins] was an active gang member and R.C. was in a rival gang in November 2017.

***

{¶34} On June 20, 2019, the jury returned verdicts finding [Hawkins] guilty of all counts and specifications. The trial court ordered a presentence investigation and set the matter for a sentencing hearing. On August 1, 2019, [Hawkins] entered a

> guilty plea to one count of having a weapon under disability. The second count was dismissed nolle prosequi. The trial court found that Counts 1, 2, and 3 of the indictment merged, and sentenced [Hawkins] to life without the possibility of parole on the aggravated murder conviction. The trial court also imposed a combined term of 28 years in prison for [Hawkins's] convictions of felonious assault, having a weapon while under disability, and the specifications. The sentence was to be served consecutively to the life sentence. [Hawkins] was given 623 days of jail-time credit.

(ECF No. 8 at PageID# 249–257) (internal citations omitted).

On August 24, 2021, the Court of Appeals issued a decision affirming the conviction and sentence. (*Id.* at PageID# 248–266). Of Hawkins's first assignment of error, the Court of Appeals found "any rational trier of fact could have found sufficient evidence was presented identifying [Hawkins] as the shooter in both incidents." (*Id.* at PageID# 257–261). Similarly, the court overruled Hawkins's second assignment of error because it found his convictions were not against the manifest weight of the evidence. (*Id.* at PageID# 261–262). The Court of Appeals then overruled Hawkins's third assignment of error after finding the trial court did not abuse its discretion in instructing the jury on complicity. (*Id.* at PageID# 262–265). Finally, the Court of Appeals found Hawkins failed to demonstrate that the trial court committed plain error in permitting the state to reopen its direct examination of a witness. (*Id.* at PageID# 265–266).

Following the Court of Appeals' decision, Hawkins filed a motion for leave to file a delayed appeal with Supreme Court of Ohio and a memorandum in support of jurisdiction. (*Id.* at PageID# 275–300, 304–340). The Supreme Court of Ohio permitted the delayed appeal but declined jurisdiction. (*Id.* at PageID# 302, 342).

## II.     FEDERAL HABEAS PROCEEDINGS

On April 10, 2023, Hawkins filed the instant federal habeas petition.  He asserts three grounds for relief:

> **GROUND ONE**:  There was insufficient evidence to sustain conviction.
>
> **Supporting Facts:**  The evidence did not support the conviction when a witness committed perjury at trial stating they see Petitioner shoot when they were shot they told police they did not know who the shooter was. The evidence for agg murder was insufficient when witness seen Petitioner enter and stay in house and did not come back out at the time of murder.
>
> **GROUND TWO:**  The Petitioner's right to due process was violated.
>
> **Supporting Facts:**  When there was not direct evidence that Petitioner was shooter or present during shooting the trial court violated due process by giving instruction to the jury not supported by the evidence violating Petitioner's right to a fair trial.
>
> **GROUND THREE:**  The Petitioner's right to a fair trial and due process was violated.
>
> **Supporting Facts:**  When the state had closed and the court allowed the reopening of testimony that was incomplete to authenticate evidence, there has been a violation of Petitioner's substantial right to a fair trial, creating a fundamental miscarriage of justice.

(ECF No. 1 at PageID# 5–8).

On September 11, 2023, Respondent filed a Return of Writ.  (ECF No. 9).  Respondent contends that Ground One lacks merit (*id.* at PageID# 1800–1810); and both Grounds Two and Three are non-cognizable in federal habeas review, are procedurally defaulted, and lack merit (*id.* at PageID# 1814–1826).  Hawkins filed a Traverse on February 20, 2024, disputing Respondent's procedural defenses and arguing the merits of his claims.  (ECF No. 16).

## III.    STANDARDS OF REVIEW

Twenty-eight U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), and the jurisprudence of procedural default guide this Court's review of Hawkins's petition.

### A.    AEDPA

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by AEDPA.  The United States Supreme Court has described AEDPA as "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court" and emphasized that courts must not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the remedy." *Burt v. Titlow*, 571 U.S. 12, 20 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA . . . imposes a highly deferential standard for evaluating state–court rulings and demands that state-court decisions be given the benefit of the doubt.") (internal quotation marks, citations, and footnote omitted).

AEDPA limits the federal courts' authority to issue writs of habeas corpus and forbids a federal court from granting habeas relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state-court decision either:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The United States Court of Appeals for the Sixth Circuit has explained the meaning of the standards found in § 2254(d)(1):

> Under the "contrary to" clause, a federal habeas court may grant the writ "if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies the law or bases its decision on an unreasonable determination of the facts, in light of the record before the state court. *Harrington v. Richter*, 562 U.S. 86, 100, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011); *Williams*, 529 U.S. at 412–13, 120 S.Ct. 1495.

*Lang v. Bobby*, 889 F.3d 803, 810 (6th Cir. 2018).

Moreover, under § 2254(d)(2), a state court's factual determination is not "unreasonable" merely because the federal habeas court would have reached a different conclusion. *Wood v. Allen*, 558 U.S. 290, 301 (2010). Instead, a state court's factual findings are "only unreasonable where they are 'rebutted by clear and convincing evidence' and do not have support in the record." *Moritz v. Woods*, 692 F. App'x 249, 254 (6th Cir. 2017) (quoting *Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017)) (internal quotation marks omitted). And "[f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding[.]" *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010) (quoting *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003)).

The burden of satisfying AEDPA's standards rests with the petitioner. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

### B.    Procedural Default

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to first present those claims to the state courts for consideration.  28 U.S.C. § 2254(b), (c).  If the prisoner fails to do so, but still has an avenue open to present the claims, then the petition is subject to dismissal for failure to exhaust state remedies.  *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (citing *Picard v. Connor*, 404 U.S. 270, 275–78 (1971)).  Where a petitioner has failed to exhaust claims but would find those claims barred if later presented to the state courts, "there is a procedural default for purposes of federal habeas."  *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).

Over time, the term "procedural default" has come to describe a situation where a person convicted of a crime in a state court fails (for whatever reason) to properly present a particular claim to the highest court of the state so that the state has a fair chance to correct any errors made in the course of the trial or the appeal, before a federal court intervenes in the state criminal process. This "requires the petitioner to present 'the same claim under the same theory' to the state courts before raising it on federal habeas review."  *Hicks v. Straub*, 377 F.3d 538, 552–53 (6th Cir. 2004) (quoting *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987)).  One of the aspects of "fairly presenting" a claim to the state courts is that a habeas petitioner must do so in a way that gives the state courts a fair opportunity to rule on the federal law claims being asserted.  That means that if the claims are not presented to the state courts in the way in which state law requires, and the state courts therefore do not decide the claims on their merits, neither may a federal court.  As the Supreme Court found in *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977), "contentions of federal law which were not resolved on the merits in the state proceeding due to [the] failure to raise them

there as required by state procedure" also cannot be resolved on their merits in a federal habeas case – that is, they are "procedurally defaulted." It is well settled that "[a] common example of a procedural default is a failure to raise a claim in state court in a timely manner." *Gibbs v. Huss*, 12 F.4th 544, 550 (6th Cir. 2021).

To determine whether procedural default bars a habeas petitioner's claim, courts in the Sixth Circuit engage in a four-part test. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *see also McNeill v. Bagley*, 10 F.4th 588, 595 (6th Cir. 2021) (citing the four-part *Maupin* standard). First, the court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with the rule. Second, the court must determine whether the state courts actually enforced the state procedural sanction. Third, the court must determine whether the forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. Finally, if the court determines that a state procedural rule was not complied with and the rule has an adequate and independent state ground, then the petitioner may still obtain review of his or her claims on the merits if the petitioner establishes: (1) cause sufficient to excuse the default and (2) that he or she was actually prejudiced by the alleged constitutional error. *Maupin*, 785 F.2d at 138. In order to establish cause, a petitioner must show that "some objective factor external to the defense" impeded the petitioner's efforts to comply with the state's procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). The petitioner bears the burden of showing cause and prejudice. *Hinkle v. Randle*, 271 F.3d 239, 245 (6th Cir. 2001).

13

## IV.     DISCUSSION

Respondent contends that Hawkins's habeas petition must be denied.  Specifically, Respondent argues that Grounds Two and Three are procedurally defaulted, and all grounds fail on the merits.

### A.     Procedural Default

The Court first considers Respondent's argument that Ground Two is procedurally defaulted before turning to the same for Ground Three.

#### 1.     *Ground Two*

Respondent argues that Ground Two is procedurally defaulted because Hawkins failed to fairly present a federal due process claim in either the Court of Appeals or the Ohio Supreme Court.  (ECF No. 9 at PageID# 1815–1817).  Hawkins responds that he raised this issue before both courts.  (ECF No. 16 at PageID# 1842).

To fairly present a claim to a state court, a petitioner must assert both the legal and factual basis for a claim.  *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).  Accordingly, a "petitioner must present his claim to the state courts as a federal constitutional issue—not merely as an issue arising under state law."  *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984).  Four actions are significant to fairly presenting a federal constitutional claim: "(1) rel[ying] upon federal cases employing constitutional analysis; (2) rel[ying] upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law."  *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).

Notably, Hawkins's appellate brief took none of these steps to preserve Ground Two as a federal claim for habeas review.  *Williams*, 460 F.3d at 806.  In his third assigned error on direct

appeal, Hawkins argued that the trial court erred in instructing the jury on complicity.  (ECF No. 8 at PageID# 172–176).  Citing Ohio cases, he argued that state law did not permit the complicity instruction.  (*Id.*).  But he did not rely on federal cases employing constitutional analysis, rely on state cases employing a federal constitutional analysis, phrase his error in terms of constitutional law, or allege facts well within the mainstream of constitutional law.  (*Id.*); *Williams*, 460 F.3d at 806.  Rather, he argued that no evidence was presented at trial that he was an aider or abettor as would allow the trial court to issue an instruction on complicity.  (ECF No. 8 at PageID# 172–176).

Still, Hawkins attempts to save his claim by arguing he raised this error "as having affected a substantial right the court would have to respect and enforce.  This includes those rights to due process and a fair trial."  (ECF No. 16 at PageID# 1842).  But Hawkins's briefing in state court has two fatal flaws.  First, it is true that Hawkins mentions his "substantial rights" in his brief of this issue to the Court of Appeals.  (ECF No. 8 at PageID# 172–173).  And, he couches this error in terms of a "substantial right to due process and a fair trial" in his brief to the Supreme Court of Ohio.  (*Id.* at PageID# 307, 313–315).  But in neither did he explain why the alleged error presents a due process or fair trial violation.  (*See id.* at PageID# 158, 172–176, 307, 313–315).  He also does not "cite federal case law identifying how errors such as those at his trial constitute denials of 'fair trial' and 'due process' rights, nor how his case mirrored cases in which such denials have been found."  *Blackmon v. Booker*, 394 F.3d 399, 400–401 (6th Cir. 2004).  The Sixth Circuit is clear that "[w]hile a petitioner need not cite 'chapter and verse' of constitutional law, 'general allegations of the denial of rights to a 'fair trial' and 'due process' do not 'fairly present claims' that specific constitutional rights were violated.'"  *Slaughter v. Parker*, 450 F.3d 224, 236 (6th Cir.

2006) (citing *Blackmon*, 394 F.3d at 400).  In short, Hawkins did not do enough to fairly present the federal issue.

Second, even assuming Hawkins's articulation of this claim before the Ohio Supreme Court was sufficient to fairly present a federal issue, his brief to the Court of Appeals falls short, as discussed above.  (*Compare* ECF No. 8 at PageID# 307, 313–315 *with* ECF No. 8 at PageID# 158, 172–176).  In other words, Hawkins's failure to fairly present a federal issue to the Court of Appeals is not cured even if he subsequently articulated a due process claim in his brief to the Supreme Court of Ohio.  (*Id.* at PageID# 305, 313–315).  Hawkins was required to fairly present the issue before each court.  *See Wagner v. Smith*, 581 F.3d 410, 418 (6th Cir. 2009) ("For a claim to be reviewable at the federal level, each claim must be fairly presented at every stage of the state appellate process").  The outcome of Hawkins's failure to do so is procedural default.

Hawkins' Traverse does not include arguments for "cause" and "prejudice" to excuse the procedural default of Ground Two.  As noted above, Hawkins argues that he raised this issue as "having affected a substantial right the court would have to respect and enforce.  This includes those rights to due process and a fair trial."  (ECF No. 16 at PageID# 1842).  But this is not a basis upon which the Court can find cause and prejudice to excuse the procedural default of this ground.

In sum, because Hawkins did not fairly present a federal constitutional issue to both the Court of Appeals and the Supreme Court of Ohio, Ground Two is procedurally defaulted.

2. *Ground Three*

Respondent further argues that Ground Three is procedurally defaulted because the Court of Appeals' plain error review of this issue is an independent and adequate basis to establish procedural default.  (ECF No. 9 at PageID# 1823–1825).  Hawkins does little to develop this argument, but he asserts that he properly raised this issue and tied it to his rights to due process and a fair trial.  (ECF No. 16 at PageID# 1842).

Central to this ground, the Court of Appeals found that Hawkins's trial counsel failed to enter a contemporaneous objection when the state reopened the questioning of a witness to authenticate a document.  (ECF No. 8 at PageID# 265).  So, the Court of Appeals considered this assignment of error under a plain error standard and found no plain error occurred.  (*Id.*).

In the end, Hawkins's failure to object when the state reopened the questioning of a witness is fatal to Ground Three.  The Sixth Circuit has held that "an Ohio court's enforcement of the contemporaneous-objection rule is 'an independent and adequate state ground' of decision sufficient to bar habeas relief."  *Hand v. Houk*, 871 F.3d 390, 417 (6th Cir. 2017) (quoting *Wogenstahl v. Mitchell*, 668 F.3d 307, 334 (6th Cir. 2012) (internal quotation marks omitted)); *see also Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006); *Goodwin v. Johnson*, 632 F.3d 301, 315 (6th Cir. 2011); *Smith v. Bradshaw*, 591 F.3d 517, 522 (6th Cir. 2010).  What's more, the Court of Appeals' "plain error review does not constitute a waiver of the state's procedural default rules and resurrect the issue . . . ."  *Keith*, 455 F.3d at 673.

In this case, the Court of Appeals enforced the contemporaneous objection rule and engaged in plain error review.  (ECF No. 8 at PageID# 265).  This represents an independent and adequate state ground of decision sufficient to bar habeas relief.  Hawkins, then, cannot raise this

17

claim for relief in a habeas petition "unless he can demonstrate cause and prejudice to excuse the default." *Hand*, 871 F.3d at 417; *see also Maupin*, 785 F.2d at 138.

But like Ground Two, Hawkins' Traverse does not include arguments for "cause" or "prejudice" to excuse the procedural default of Ground Three.  Hawkins again argues that "[t]he petitioner raised the issue of reopening the state's case as effecting his substantial rights.  This includes those rights to due process and a fair trial."  (ECF No. 16 at PageID# 1842).  Yet, this does not present a basis on which the Court can find cause and prejudice to excuse the procedural default of Ground Three.

In sum, because Hawkins failed to object when the state reopened the questioning of a witness—and because the Court of Appeals enforced Ohio's contemporaneous objection rule— Ground Three is procedurally defaulted.

## B.    Merits

As explained above, both Grounds Two and Three are procedurally defaulted.  But even if they were not, Respondent challenges them on the merits.  Respondent also argues Ground One lacks merit.  The Court considers each in turn.

### 1.    *Ground One*

In Ground One, Hawkins contends that he is entitled to habeas relief because the evidence at his trial was not sufficient to support his convictions for felonious assault and aggravated murder.  (ECF No. 1 at PageID# 5).  Specifically, Hawkins argues that R.C., who was the victim of the felonious assault charge, lied when he identified Hawkins as the shooter at trial because he was unable to identify Hawkins on the night that he was shot.  (*Id.*).  Hawkins also says that the

evidence was insufficient to support his aggravated murder conviction because his alibi witness,

R.P., testified that she saw him somewhere else at the time of the murder. (*Id.*).[2]

Hawkins asserted Ground One as his first assignment of error to the Court of Appeals.

(ECF No. 8 at PageID# 257). The Court of Appeals found the following evidence supported

Hawkins' convictions for felonious assault and aggravated murder:

{¶44} In the present case, R.C. testified that [Hawkins] shot him on November 12, 2017. R.C. initially described the shooter to law enforcement as a light-skinned African American male with a beard and glasses. According to R.C., the individual yelled "Oh, is that [R.C.] and "Do you***want some too?" before shooting and fleeing toward Main St. While R.C. originally could not identify the shooter, R.C. testified that after seeing a series of photographs on Instagram, "I knew exactly who it was." R.C. identified [Hawkins] in the courtroom as the individual that shot him on November 12, 2017. Ohio courts have held that the testimony of a sole witness, if believed, is sufficient to support a conviction. In a sufficiency of the evidence analysis, "[t]he court essentially assumes that state's witnesses testified truthfully and determines whether that testimony satisfies each element of the crime." Here, under the presumption that the witnesses' testimony is truthful, appellee has presented sufficient evidence that identifies [Hawkins] as the shooter of R.C. on November 12, 2017.

{¶45} Moreover, there is substantial circumstantial evidence that established [Hawkins] as the person who shot R.C. First, AC. testified that on November 12, 2017, [Hawkins] was driving a dark vehicle with temporary tags and asked her if "Y'all from Berk." AC. stated that soon after [Hawkins] drove away, she heard "[s]hots." E.Y. testified that an individual in a black vehicle shot at two individuals walking down the sidewalk. E.Y. described the vehicle to law enforcement as a black car with 30-day temporary tags. "He didn't slow down a lick. He didn't hit his brake lights or nothing." While E.Y. was unable to see into the vehicle, his description matched A.C.'s account. Similarly, R.C. testified that the shooter was driving a black vehicle displaying 30-day temporary tags.

{¶46} Regarding the shooting of K.W., AC. testified to witnessing an individual shoot K.W. from the same dark vehicle she saw earlier that day. The surveillance video confirms the shooter fired at K.W. from a black vehicle. The cell phone records indicate [Hawkins'] general location before and after the shootings, which

---

[2] In his Traverse, Hawkins also challenges the reliability of witness, A.C.'s, identification of him in a lineup, and the scientific integrity of the ballistics evidence. (ECF No. 16 at PageID# 1845). Neither of these arguments were included in Hawkins' direct appeal, (ECF No. 8 at PageID# 153–181), and because these arguments were asserted for the first time in a Traverse, they are not properly before the Court. *See Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005) ("Because the penalty-phase insufficiency argument was first presented in Tyler's traverse rather than in his habeas petition, it was not properly before the district court, and the district court did not err in declining to address it").

establish his proximity to both shootings. Moreover, the records from Condado Tacos indicate that [Hawkins] was not at work during either incident.

{¶47} There is also meaningful evidence that [Hawkins's] vehicle was used in the commission of both shootings. Appellee presented substantial evidence regarding [Hawkins'] ownership of the black Hyundai, the purchase of the vehicle, and the temporary tags discovered in the trunk. [Hawkins's] use of the vehicle is also evident from the BMV documentation and traffic tickets recovered in the glove compartment. Moreover, the two casings found at the crime scene of K.W. matched the two casings found lodged in the hood of [Hawkins'] vehicle. Taking all this evidence into account, as well as [Hawkins's] own social media posts, text messages, and statements during the jail calls, there is substantial evidence connecting [Hawkins] to these shootings. Appellee need only present sufficient evidence, not the best possible evidence, to survive a challenge on insufficient evidence grounds.

(ECF No. 8 at PageID# 259–261) (internal citations omitted).

The well-settled standard of review for evaluating the merits of constitutional claims challenging the sufficiency of the evidence was established by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307 (1979).  The Supreme Court held that, because the Due Process Clause requires the state to prove beyond a reasonable doubt every fact necessary to constitute the charged offense, "the relevant question" in assessing the sufficiency of the evidence "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson*, 443 U.S. at 319 (emphasis in original).

Under the *Jackson* standard, the state is not required to rule out every hypothesis except that of guilt beyond a reasonable doubt.  *Id.* at 326.  Rather, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution and must defer to that resolution."  *Id.*; *see also Walker v. Engle*, 703 F.2d 959, 969–70 (6th Cir. 1983).  It is the responsibility of the trier of fact to resolve conflicts in testimony,

to weigh the evidence and to draw reasonable inferences from the evidence. *Jackson*, 443 U.S. at 319. Consequently, the reviewing court is not permitted to reweigh the evidence, reevaluate the credibility of witnesses, make its own subjective determination of guilt or innocence, or otherwise substitute its opinion for that of the jury. *See id.* at 318–19 & n.13; *see also United States v. Fisher*, 648 F.3d 442, 450 (6th Cir. 2011) (citing *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009)).

Federal habeas review of a claim challenging the sufficiency of the evidence is even more limited. As the Sixth Circuit explained in *Brown*, the federal habeas court is "bound by two layers of deference to groups who might view facts differently than [the habeas court] would." 567 F.3d at 205. The federal habeas court must defer not only to the trier of fact's findings as required by *Jackson*, but under 28 U.S.C. § 2254(d), must also "defer to the *state appellate court's* sufficiency determination as long as it is not unreasonable." *Id.* (emphasis in original); *see also Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011). The Sixth Circuit went on to emphasize in *Brown*:

> [W]e cannot rely simply upon our own personal conceptions of what evidentiary showings would be sufficient to convince us of the petitioner's guilt. We cannot even inquire whether *any* rational trier of fact would conclude that petitioner...is guilty of the offenses for which he was charged. Instead, we must determine whether the Ohio Court of Appeals itself was unreasonable in *its* conclusion that a rational trier of fact could find [the petitioner] guilty beyond a reasonable doubt based on the evidence introduced at trial.

567 F.3d at 205 (emphasis in original).

The jury found Hawkins guilty of felonious assault, aggravated murder, and murder. Applying the double-layer deferential standard here, the Court of Appeals' sufficiency determination is neither contrary to nor an unreasonable application of *Jackson*.

Hawkins first challenges the sufficiency of the evidence for his felonious assault conviction based on the testimony of R.C. R.C. testified that he was shot on Berkeley Street on the afternoon of November 12, 2017. (ECF No. 8-3 at PageID# 647). R.C. was walking to the store when a

black car with temporary tags and a silver grill pulled up and stopped, the driver said his name and "do you *** want some too," and shot him.  (*Id.* at PageID# 648–649).  R.C. was shot in the hip, and the bullet exited his buttock.  (*Id.* at PageID# 651).  R.C. identified Hawkins as the shooter from the witness stand.  (*Id.* at PageID# 650).  R.C. testified that he was unable to identify Hawkins to the police the night he was shot but was later shown pictures of Hawkins on Instagram and recognized him as the shooter.  (*Id.* at PageID# 656–657).

Hawkins argues that the evidence was insufficient to support a conviction for felonious assault because R.C.'s testimony should not be believed.  But the jury heard R.C.'s testimony and resolved any credibility issues in favor of a guilty verdict.  As noted above, the Court is not permitted to reweigh the evidence, reevaluate the credibility of witnesses, make its own subjective determination of guilt or innocence, or otherwise substitute its opinion for that of the jury.  The Court is bound to defer to the jury's resolution of factual issues *and* the Court of Appeals' decision that the evidence was sufficient to support the conviction.  *Jackson*, 443 U.S. at 319; *Brown*, 567 F.3d at 205.  The Court of Appeals reasonably concluded that R.C.'s testimony and other circumstantial evidence was sufficient to support the conviction for felonious assault.

Next, Hawkins challenges the sufficiency of the evidence to support his aggravated murder conviction based on the testimony of his alibi witness, R.P.  R.P. testified that she dated Hawkins during 2017 and described their relationship as "toxic."  (ECF No. 8-6 at PageID# 1454).  R.P. explained that she was angry because she lost two pregnancies with Hawkins to miscarriage and found out that he fathered children with another woman.  (*Id.* at PageID# 1455–1456).  R.P. testified that on November 12, 2017, she got into a fight with Hawkins because his other girlfriend was pregnant.  (*Id.* at PageID# 1469).  R.P. testified that she parked her car at Hawkins' girlfriends' apartment to "catch him."  (*Id.* at PageID# 1472).  R.P. testified that she saw Hawkins arrive at the

apartment at 7:55 p.m., which is the approximate time that surveillance cameras captured the shooting of K.W. (*Id.* at PageID# 1472–1473; ECF No. 8-5 at 1170–1171). R.P. testified that she saw Hawkins exit the passenger side of his vehicle and enter the apartment. (ECF No. 8-6 at PageID# 1473). R.P. testified that she remained in her vehicle until 9:22 p.m., sending Hawkins threatening text messages. (*Id.* at PageID# 1475).

On direct examination, R.P. testified that she provided the police with the initial information that Hawkins was involved in the shootings, but she lied. (*Id.* at PageID# 1486). Also on direct examination, R.P. denied telling the police that Hawkins confessed to her. (*Id.* at PageID# 1481). But on cross-examination, R.P. claimed that she lied when she told police that Hawkins admitted to shooting the man that "didn't make it." (*Id.* at PageID# 1521, 1531). R.P. admitted on cross-examination that in the two years that elapsed since she implicated Hawkins, she never told the police that she lied about Hawkins' involvement. (*Id.* at PageID# 1533–1534). R.P. also admitted on cross-examination that she lied a "number of times" and is a liar. (*Id.* at PageID# 1490–1491). R.P. admitted visiting Hawkins in jail twenty-three times, including during the trial, but denied talking about the case. (*Id.* at PageID# 1513–1515).

Hawkins contends the jury verdict is inconsistent with his proffered version of events, but the jury resolved conflicts in the evidence and rendered a guilty verdict. The Court is bound to defer to the jury's verdict and is not entitled to reevaluate the weight of R.P.'s credibility verses the other evidence of guilt presented at trial. The Court is also bound to defer to the Court of Appeals' reasonable conclusion that sufficient evidence supported the aggravated murder conviction, including the evidence tying Hawkins' vehicle to the shooting and his inculpatory statements on Facebook and during jail calls.[3]

---

[3]     The content of the Facebook statements and jail calls is discussed in detail in connection with Ground Three, *infra*.

Because the Court is bound to defer to the jury's credibility determinations and the Court of Appeals' reasonable determination that there was sufficient evidence to support Hawkins' convictions for felonious assault and aggravated murder, Ground One is without merit and should be dismissed.

2. *Ground Two*

In Ground Two, Hawkins contends that his due process rights were violated when the trial court permitted a jury instruction that Hawkins could be convicted of aggravated murder as a complicitor. The Court concluded above that Ground Two is procedurally defaulted. That said, Ground Two fails on the merits notwithstanding the procedural default.

At the close of evidence, Hawkins's counsel objected to the inclusion of a complicity jury instruction. Counsel argued that the state failed to present any evidence of another person's involvement in the shooting of K.W. (ECF No. 8-6 at PageID# 1562–1566). So, the complicity language was inappropriate. (*Id.*). The state countered that it was entitled to the instruction because no witness had identified the shooter in the killing of K.W. (*Id.*) The trial court permitted the instruction's inclusion after the state affirmed it would argue complicity in its closing argument. (*Id.* at PageID# 1576–77 ("We will see how it pans out. I'm going to leave it in for now."); *see also id.* at PageID# 1600). After closing arguments, the defense renewed its objection. (*Id.* at PageID# 1665–1674). The defense argued that a complicity theory was not included in the indictment, the defense was not given fair notice of the issue, and Hawkins was denied the chance to mount a complete defense. (*Id.*). The trial court permitted the instruction, explaining:

> It's textbook that Mr. Hawkins does not have to be indicted as a complicitor. If you indict somebody, the indictment alone is sufficient to charge that person as a principal or as a complicitor. So just because it wasn't in the indictment, that's here nor there. It's all up to what evidence was submitted at trial.

And I think what solidified it for me, because frankly I was on the fence as to whether or not I was going to give a complicity instruction, but what solidified it for me was, frankly, your suggestion saying that there's no I mean, they didn't see only him in the car. The camera didn't see only him, you know, there could have been more than one individual in that car; which are all true statements. There could have been more than one individual in that car. What we do know is that his car was there. So, if his car was there and the jury believes that he was there, that there were other people in the car, then I think that complicity would be appropriate. Because they don't see in the car, they don't just have him, they don't have a direct identification; but the seed has been planted now, by the State and yourself upon your questioning of these witnesses, that there might have been other people in that car. And because there might be other people in that car, and we don't have anybody saying he was the shooter then I think it's appropriate for them to consider that even if he wasn't the shooter but that he was in that car complicity does apply.

So, I'm not going just on, you know, any one individual, but I think his statements that he made on the jail calls and the evidence that has been elicited in the form of there may have been more than one person in the car it's appropriate for the jury to consider that. Frankly, also, I think it may help your client because the mere presence is not enough. So it may be that they find somebody else in the car shot and they're not going to – they're not going to go so far as to say complicity applies. But given the evidence, I think it's appropriate for the jury to have in front of them to consider that.

(*Id.* at PageID# 1675–1677). The jury was accordingly instructed that Hawkins could be convicted of aggravated murder as a complicitor if he "solicited or procured another to commit the offense or aided or abetted another in committing the offense with the same knowledge or purpose as required by the offense under consideration." (ECF No. 8-7 at PageID# 1703–1704).

On appeal, the Court of Appeals determined that the trial court did not abuse its discretion under Ohio law by permitting the complicity instruction. (ECF No. 8 at PageID# 262–265). It held because the defense strategy was to cast doubt on his identity as the shooter and because there was evidence that Hawkins made a statement on a jail call that he had to "figure out *** who used the car," the trial court had a "reasonable basis" to include the complicity instruction (*Id.*). Whether the Court of Appeals' conclusions were proper under Ohio law is not cognizable on federal habeas review. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province

of a federal court to reexamine state-court determinations on state-law questions"). The Court of Appeals' opinion did not address due process because, as discussed above, Hawkins did not fairly present Ground Two to the Court of Appeals as a federal constitutional issue.

Still, in his habeas petition, Hawkins alleges the complicity instruction violated his due process rights. "In a habeas proceeding, allegedly improper jury instructions must be shown to have infected the accused's trial to such a degree as to constitute a clear violation of due process. The petitioner must show more than that the instructions are undesirable, erroneous, or universally condemned." *Wood v. Marshall*, 790 F.2d 548, 551 (6th Cir. 1986); *see also Coe v. Bell*, 161 F.3d 320, 329 (6th Cir. 1998). "To warrant habeas relief, 'jury instructions must not only have been erroneous, but also, taken as a whole, so infirm that they rendered the entire trial fundamentally unfair. The burden is even greater than that required to demonstrate plain error on appeal.'" *Buell v. Mitchell*, 274 F.3d 337, 355 (6th Cir. 2001) (quoting *Scott v. Mitchell*, 209 F.3d 854, 882 (6th Cir. 2000)). Even if Ground Two was not procedurally defaulted, Hawkins does not meet this burden. Hawkins has not demonstrated how the complicity instruction was erroneous or how it rendered his entire trial fundamentally unfair. (*See* Doc. 16 at PageID# 1846–47 (arguing the Court of Appeals' conclusion was unreasonable given the facts set forth by the state in their case in chief)). He has also failed to name a United States Supreme Court case that supports habeas relief under these circumstances. (*See id.*).

Finally, to the extent that Hawkins' petition could be interpreted as asserting a claim that his due process rights were violated because he was not on notice that he could be convicted under a theory of complicity, this argument also fails. Ohio Revised Code § 2929.03 states that "[a] charge of complicity may be stated in terms of this section, or in terms of the principal offense." And Ohio and federal courts have expressly acknowledged that "a defendant may be indicted for

26

the commission of a substantive crime as a principal offender and convicted of aiding and abetting its commission although not named in the indictment as an aider and abettor without violating federal due process." *Hill v. Perini*, 788 F.2d 406, 406–07 (6th Cir. 1986) (also noting in this circumstance, "a jury instruction regarding complicity may be given" if "the evidence at trial reasonable indicates that the defendant was an aider and abettor rather than a principal offender). *See also State v. Herring*, 94 Ohio St. 3d 246 (2002) ("R.C.2923.03(F) adequately notifies defendants that the jury may be instructed on complicity, even when the charge is drawn in terms of the principal offense."); *Anderson v. Coyle*, 173 F.3d 854 (6th Cir. 1999) (collecting cases); *Harrington v. Warden, London Corr. Inst.*, No. 1:10-CV-751, 2012 WL 1143483, at *13 (S.D. Ohio Apr. 5, 2012), *report and recommendation adopted,* No. 1:10-CV-751, 2013 WL 5944193 (S.D. Ohio Nov. 5, 2013).  In other words, Hawkins was on notice he could be convicted as a complicitor based on the indictment alone.  (*See* Doc. 8 PageID# 29–33).

In sum, even if it was not procedurally defaulted, Ground Two should be dismissed because it lacks merit.

### 3.    *Ground Three*

In Ground Three, Hawkins contends that his due process rights were violated when the trial court permitted the state to re-open the testimony of a witness to authenticate an exhibit.  The Court concluded above that Ground Three is procedurally defaulted.  Even still, it should be dismissed because it lacks merit.

The state called Amber Gill, a criminal analyst for the Columbus Police Department, as a witness at trial.  (ECF No. 8-4 at PageID# 953–1021).  Prior to Gill's testimony, the defense objected to state's Exhibit "V," Facebook records, on the grounds that they contained purported statements made by Hawkins that were inappropriate character evidence and violated his right

against self-incrimination.  (*Id.* at PageID# 945–946).  The trial court ruled that the Facebook records were admissible if the state court laid a proper foundation that the records were related to Hawkins and the statements contained therein met an applicable hearsay exception.  (*Id.* at PageID# 949).

Gill testified that she assisted in obtaining a search warrant and was tasked with investigating Hawkins's Facebook page and Bureau of Motor Vehicle (BMV) records.  (*Id.* at PageID# 956–957).  Gill testified about a post on Hawkins's Facebook page on November 15, 2017, her efforts to confirm that the page was registered to Hawkins, and the temporary tags provided by BMV for Hawkins's Hyundai Elantra. (*Id.* at PageID# 960–969).

When the prosecutor concluded her direct examination of Gill, the trial court called the attorneys to the bench and expressed a concern that the state had not laid a proper foundation for the admission of Exhibit "V," the Facebook records.  (*Id.* at PageID# 969–988).  The parties discussed the contents of the Facebook records, the state's intent to question Gill about Hawkins's statements in the records, and the defense's position that some of the statements were hearsay. (*Id.*).  The defense did not object to the prosecutor re-opening her direct examination to posit additional questions about the Facebook records.  (*Id.*).

The state re-opened its direct examination of Gill and questioned her in detail about the Facebook subscriber information and IP address that tied Hawkins to the documents included in "Exhibit V."  (*Id.* at PageID# 990–993).  Gill also testified about the specific content of conversations Hawkins had with three individuals via Facebook messenger on September 21, 2017, November 11, 2017, and November 15, 2017.  (*Id.* at PageID# 993–1001).  During these conversations Hawkins states, *inter alia*, "Bro I'm the winning side them bout to get picked off,"

(*id.* at PageID# 999), and "Bro I got cars guns and moneys in rotation right now all with one mission get them Berk ****." (*Id.* at PageID# 999–1000).

Like Ground Two, Hawkins presented Ground Three to the Court of Appeals solely as an issue of Ohio law. The Court of Appeals concluded, "the trial court's decision to deviate from the order of proceedings was not unreasonable as it appeared intended to clarify the testimony and prevent any subsequent evidentiary disputes." (ECF No. 8 at PageID# 265). The Court of Appeals also concluded that Hawkins was not prejudiced by the trial court's decision because his counsel was permitted a full opportunity for cross-examination. (*Id.*). More still, the Court of Appeals determined that the admission of the Facebook records did not substantially impact the outcome of the trial given the other evidence of guilt, including: "witness statements and identification, the matched casings at the scene of the homicide and in [Hawkins's] vehicle, jail calls, discovery of the temporary license plate, and [Hawkins's] own statements." (*Id.*)

Hawkins contends that he is entitled to habeas relief because the trial court permitted the state to re-open Gill's testimony to establish a foundation for the admissibility of the Facebook records. Like Ground Two, to the extent Hawkins is seeking a review of the trial court's decision under Ohio law, it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. *Estelle*, 502 U.S. at 67–68.

Hawkins alleges in his federal habeas petition that the trial court's decision to permit the prosecutor to re-question Gill for proper authentication of the Facebook records infringed on his due process rights. "[E]rrors in the application of state law, especially rulings regarding the admission or exclusion of evidence, are usually not to be questioned in a federal habeas corpus proceeding." *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988). A trial court's decision on the recall of a witness is "evidentiary in nature." *See Buder v. Bell*, 306 F.2d 71, 75 (6th Cir. 1962).

Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they "offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996) (quoting *Patterson v. New York*, 432 U.S. 197, 202 (1977)); *see also Spencer v. State of Tex.*, 385 U.S. 554, 563–64 (1967).

Hawkins has failed to show an error of constitutional dimension.  What's more, Hawkins cannot demonstrate that the trial court's decision to permit the authentication of the Facebook records had a "substantial and injurious effect or influence" on the outcome of his trial." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946).  Hawkins made inculpatory statements in the Facebook records.  However, other substantial inculpatory statements made by Hawkins were introduced at trial.

In jail calls, the jury heard Hawkins referring to "holding courts in these streets," (ECF No. 8-5 at PageID# 1211), and referencing the death of Buda-bang:  "Two weeks after his funeral, man two weeks after this funeral, man *** Nobody dropped. As soon as I get involved in it—as soon as I get involved in it, you seen what happened. You seen—once I get to calling the shots, you seen what happened, man." (*Id.* at PageID# 1349–1350).  The jury also heard Hawkins on a jail call asking his associate to delete incriminating information from his phone and social media.  (*Id.* at PageID# 1217–1219).  The jury heard that Hawkins sent text messages on November 16, 2017, stating, "I'm one of Lucifer's death angels" and "We all have a debt to pay."  (ECF No. 8-4 at PageID# 1072).

Given the independent inculpatory statements that were introduced at trial, Hawkins cannot demonstrate that he was prejudiced by the trial court's decision to permit the state to re-open Gill's testimony to authenticate the Facebook records.

For these reasons, even if Ground Three was not defaulted it should be dismissed for lack of merit.

## V.    CONCLUSION

Hawkins' claims are without merit. It is therefore **RECOMMENDED** that the habeas petition be **DENIED,** and this action be **DISMISSED WITH PREJUDICE.**

For the foregoing reasons, the Undersigned **RECOMMENDS:**

1.  Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (ECF No. 1) be **DENIED** with prejudice.

2.  A certificate of appealability should not issue with respect to the petition because petitioner has not stated a "viable claim of the denial of a constitutional right" or presented an issue that is "adequate to deserve encouragement to proceed further." *See Slack v. McDaniel*, 529 U.S. 473, 475 (2000) (*citing Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)); *see also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

3.  With respect to any application by a petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would not be taken in "good faith," and therefore **DENY** Petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity. *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman*, 117 F.3d 949, 952 (6th Cir. 1997).

## <u>PROCEDURE ON OBJECTIONS</u>

If any party objects to this Report and Recommendation, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting

authority for the objection(s).  A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence, or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo* and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

**IT IS SO RECOMMENDED**.


Date:  October 31, 2024                           */s/ Kimberly A. Jolson*
                                                 Kimberly A. Jolson
                                                 UNITED STATES MAGISTRATE JUDGE