**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**MARZETT HAWKINS III,**

**Plaintiff,**

**v.**

**WARDEN, SOUTHEASTERN CORRECTIONAL INSTITUTION,**

**Defendant.**

**Case No. 2:23-cv-1254**

**JUDGE DOUGLAS R. COLE**
**Magistrate Judge Jolson**

**OPINION AND ORDER**

An Ohio jury found plaintiff Marzett Hawkins III guilty of multiple crimes, including one count of aggravated murder. The trial court sentenced Hawkins to life in prison without the possibility of parole. Ohio's Tenth District Court of Appeals affirmed both the conviction and sentence, and the Ohio Supreme Court declined review. Hawkins now mounts a collateral attack on his conviction and sentence in habeas. On October 31, 2024, the assigned Magistrate Judge issued a Report and Recommendation (R&R), (Doc. 17), recommending that the Court deny that petition. Hawkins has since objected, (Doc. 20). For the reasons discussed below, the Court **OVERRULES** Hawkin's objections, **ADOPTS** the R&R, and therefore **DISMISSES** the petition **WITH PREJUDICE**.

**BACKGROUND**

On June 20, 2019, an Ohio jury convicted Hawkins of four counts: one count of aggravated murder, in violation of Ohio Revised Code (R.C.) § 2903.01, two counts of murder, in violation of R.C. § 2903.02, and one count of felonious assault, in violation

of R.C. § 2903.11. (Doc. 8, #145–46). Adding a little more fuel to the fire, Hawkins later pleaded guilty to one count of having weapons while under a disability, in violation of R.C. § 2923.13. (*Id.* at #147). At sentencing, the second two murder counts merged with the aggravated murder count, and the State elected to sentence based on the latter. (*Id.*). The trial court then sentenced Hawkins to imprisonment for life without the possibility of parole on that count. (*Id.*). As for the felonious assault count and the felon-in-possession count, the court sentenced Hawkins to 28 years in prison, to run consecutive to the life term. (*Id.*).

### A. Hawkins' Trial

Hawkins' habeas claims all relate to the trial that preceded that sentence. Understanding those claims requires a detailed exposition of the facts, both those relating to the crimes for which he was convicted and those relating to the state court proceedings. As to the former, the Court must take Ohio's Tenth District Court of Appeals' account of the facts adduced at that trial at face value, at least absent any dispute from Hawkins.[1]

The prosecution's theory of the case was that Hawkins had committed two drive-by shootings as part of an ongoing feud between two Columbus criminal gangs. One of the prosecution's key witnesses was R.C., the victim of one of the two

[1] 28 U.S.C. § 2254(e)(1) commands the Court to "presume[] … correct" any "determination of a factual issue made by a State court" unless Hawkins can present clear and convincing evidence that the Ohio court was incorrect. And because the Ohio Supreme Court did not provide a reasoned analysis in denying Hawkins' appeal from the Tenth District, the Ohio Court of Appeals's opinion, (Doc. 8, #248–66), provides the basis for review here. *See Wilson v. Sellers*, 584 U.S. 122, 128–30 (2018).

shootings.[2] (Doc. 8-3, #637, 646). R.C. testified that he was shot in the afternoon on November 12, 2017, in Columbus's Mound and Berk neighborhood (named for the intersection between East Mound Street and Berkely Road), where he lived. (*Id.* at #646–47). According to R.C., a black car with 30-day temporary tags pulled up next to him while he was walking on the street with his nephew. (*Id.* at #647–48). Someone in the car rolled down the window and said, "Oh, is that [R.C.]? Do you … want some too?" (*Id.* at #649). The same person then shot R.C. in the hip and "took straight off," running multiple stop signs in the process. (*Id.* at #651).

E.Y., a resident of the area, largely corroborated that account. (Doc. 8-2, #459–60). He testified that he saw an individual in a black vehicle shoot from the driver's side at two men who were walking on the sidewalk. (*Id.* at #462). After that, the car sped off at "70 miles an hour or better," running at least three stop signs. (*See id.* at #462–63). Like R.C., E.Y. also noticed that the black car had a 30-day tag. (*Id.* at #465).

A.C. lived in the area as well. (*Id.* at #557–59). She testified that, around noon that day, a dark car pulled up to her while she was sitting on her porch. (*Id.* at #561–62). The driver, a bald, light-skinned, Black man with glasses and a beard, asked her "[a]re you from Mound & Berk." (*Id.* at #562). She said "no," and the car drove off. Soon after that, she heard gunshots. (*Id.* at #564). In addition to identifying Hawkins as the driver in a photo array, (Doc. 8-5, #1152–53), she identified Hawkins as the driver in open court, (Doc. 8-2, #583–84).

---

[2] The Court follows the R&R in maintaining the Tenth District's abbreviation of the victims' and lay witnesses' names. (*See* Doc. 17, #1851 n.1).

Officers interviewed R.C. at the hospital. He told them the shooter was a light-skinned Black male. (*Id.* at #488–89). R.C. did not know who the shooter was at that time, (*id.* at #490), but according to the officer who testified at trial, R.C. recalled the black car's flight just as he later would at trial, (*id.* at #494).

Before describing his shooting, R.C. had offered some background on brewing tensions between rival gangs in the area. The Mound and Berk neighborhood, R.C. explained, was "known for high gang activity," and was controlled by the Mound and Berk Bloods (MOB), of which R.C. was a member. (*Id.* at #640–41). At the time of the shooting, MOB and the Easthaven Bloods were feuding. A member of MOB had killed an Easthaven Bloods member at a club. (*Id.* at #644–45). Anthony Johnson, a former detective, testified for the prosecution as an expert on criminal street gangs in Columbus. (Doc. 8-5, #1285, 1291). He recalled the early 2017 club shooting where "a bunch of Easthaven guys and MOB guys [were] shooting back and forth at each other," resulting in the death of one Easthaven member. (*Id.* at #1311–12). Johnson further identified Hawkins in open court, noting that Hawkins was a known member of the Easthaven Bloods. (*Id.* #1312–13).

Later in the evening on November 12, 2017, the same day that R.C.'s shooting occurred, an individual shot and killed K.W. in the same neighborhood, while he was walking on the sidewalk. (Doc. 8-2, #506–08, 510). One of the detectives on the scene, Lisa Swisher, testified to finding multiple shell casings and a live bullet in the area. (*Id.* at #519).

The same A.C. who had encountered the black car earlier that day testified about K.W.'s shooting as well. She said that a little after 8:00 p.m. she was walking down the street when she saw "the same car from earlier that day." (*Id.* at #568). She had been trying to obtain a dollar from K.W., who was walking on the street. (*Id.*). But when someone in the car opened fire on K.W. (whom she did not know), she ran away. (*Id.* at #570–71).

The police also obtained and preserved video footage from a nearby building's security camera. (*Id.* at #554–55). C.W., K.W.'s girlfriend, identified K.W. on the security video and explained that he had left their home to walk to a nearby market. (Doc. 8-3, #751, 771–72). Jeffrey Brenner, the prosecution's expert in "Audio/visual forensics," analyzed the video as it played. (Doc. 8-3, #852). He testified that it shows a muzzle flash emanating from the driver's side of the car. (*Id.* at #862). Leading up to that, the car had stopped at the market where K.W. had gone, and then went down an alley, off screen. (*Id.* at #854). After a few minutes, the car returned and someone in it shot K.W. (*Id.* at #854–55). While the video analysis provided basic information about the vehicle and offered help with the timeline, Brenner could not read the license plate. (*Id.* at #857–58).

While investigating these two shootings,[3] officers learned that Hawkins had recently purchased a black Hyundai sedan with temporary tags. (Doc. 8-2, #555).

[3] A curious reader may wonder why, if only one victim died, Hawkins faced two separate murder counts and an aggravated murder count. All three related to K.W.'s death. The aggravated murder count required the state to show Hawkins caused K.W.'s death with purpose and "prior calculation and design." (Doc. 8-7, #1705). The first murder count was a lesser-included offense—the state needed only to show purpose. (*Id.* at #1713). The second murder count was for felony-murder; the state needed to show that Hawkins caused K.W.'s

They also obtained Hawkins' cell phone number and a court order allowing them to roughly track the phone's location. (*Id.* at #556; Doc. 8-3, #714). Using the phone as a proxy, officers found what they determined to be Hawkins' black Hyundai. (Doc. 8-3, #717). This car did not have 30-day tags, but its permanent tags were registered to a different vehicle—a white Chevy SUV belonging to Hawkins' aunt. (*Id.* at #717–18). This led the police to believe that the tags "had been switched out." (*Id.* at #717). Officers then surveilled the apartment where the car was located and, after knocking on the door, found Hawkins, arrested him, and took him into custody. (*Id.* at #718–19).

Officers then searched the car. They found shell casings "caught near the wiper blades there between the windshield and the hood of the vehicle." (*Id.* at #720). The prosecution's firearms expert, Brian Johnson, testified that, after testing, he determined that the same weapon fired the shell casings found there and at the scene of K.W.'s killing. (Doc. 8-4, #919–23). He also opined that shooting a firearm from the driver's side of the vehicle could cause casings to land on the windshield. (*Id.* at #927). Separately, Amber Gill, a criminal intelligence analyst, testified that information she obtained from the BMV showed that Hawkins had completed a temporary tag registration application for the black Hyundai on September 15, 2017. (*Id.* at #967).

The prosecution also offered evidence about Hawkins' location at various points on November 12, 2017. P.L. was Hawkins' supervisor at work. (Doc. 8-4, #874–

death "as a proximate result of … committing or attempting to commit a felonious assault." (*Id.* at #1715). Of course, as noted above, only the aggravated murder count mattered at sentencing. (Doc. 8, #147).

75, 878). He testified about his company's automated timecard practice, which shows the clock-in and clock-out time for employees each day they work. (*Id.* at #880–81). Hawkins' timecard showed that, on November 12, 2017, he clocked in at 4:05 P.M. and clocked out at 7:43 P.M. (*Id.* at #883). P.L. also testified that he specifically remembered Hawkins leaving after clocking out. (*Id.* at #883–84). Hawkins worked at a restaurant on High Street in downtown Columbus. (*Id.* at #880). The surveillance footage's timestamp for K.W.'s shooting later that night was 8:09 P.M. (Doc. 8-3, #854).

Detective James Howe testified about Hawkins' cell phones as an expert on digital forensics and cell-site analytics. (Doc. 8-4, #1022, 1025–26). He testified to Hawkins' phone call records on that evening. First, he testified that an outgoing call that lasted ten seconds at 7:47 P.M. was, according to the cell-site location information (CSLI), in the vicinity of 132 South High Street, where Hawkins had just clocked out. (*Id.* at #1056–57). There were no calls between then and 8:15 P.M. (*Id.* at #1062). Howe testified that it would be consistent with the difference in location between those two calls for the person to have travelled from downtown to Lilley Avenue, where K.W. was shot, and then fled north to the general area indicated by the CSLI for the 8:15 phone call. (*Id.* at #1062–63).

Finally, the prosecution provided evidence of Hawkins' statements. Anthony Johnson (the gang expert from earlier) also testified about Hawkins' recorded statements in phone calls. Hawkins had voiced his close connection to the fallen Easthaven Blood member from earlier that year. (Doc. 8-5, #1345–46). Hawkins

added that, at this person's funeral, he listened to others in the Easthaven Gang "talk about what they were going to do." (*Id.* at #1349). Hawkins "gave it two weeks [after the funeral] to see what [they] were going to do," but "[n]obody dropped." (*Id.*). As Johnson understood this statement, Hawkins was saying in effect that "he had to take matters into his own hands." (*Id.*). But, Hawkins said, "once [he got] to calling the shots," the others "seen what happened, man." (*Id.* at #1350).

Gill, who had earlier testified about Hawkins' BMV records, also testified about his social media activity. (Doc. 8-4, #960). On November 15, three days after the shootings of R.C. and K.W., Hawkins had posted to Facebook that "[p]eople showing they true colors everyday, but check digg I'm on some straight homicide ... so keep that fake love from round me." (*Id.* at #961). Gill later testified that she had confirmed the Facebook page was in fact Hawkins' because there were multiple pictures of him on the page and the records of identifying information Facebook provided (in response to a search warrant) showed that the account was in his name. (*Id.* at #969, 991).

Beyond that information, Facebook also produced personal message conversations between Hawkins and others. (*Id.* at #992). Some of the messages are apparently between Hawkins and gang affiliates. (*See id.* at #994). Out of many messages, perhaps the most significant are Hawkins' September 21, 2017, statement that "I got cars guns and moneys in rotation right now all with one mission to get them Berk n***s" and his question to his reluctant opposite number, "[s]o you riding with them??" (*Id.* at #999–1000).

Detective Howe, the cell-phone expert, testified that four days after the shootings, on November 16, Hawkins sent several text messages. In one, Hawkins said that he was "one of Lucifer's death angels." (*Id.* at #1072). In another, he said that "[w]e all have a debt to pay." (*Id.*).

Finally, Detective Hughes testified about incriminating statements Hawkins made from jail shortly after being arrested. For instance, Hawkins told someone to "[s]crub" his social media page in case he "might have been saying anything swoozie." (*Id.* at #1219). And, after learning that the police had evidence linking his car to a homicide, Hawkins told the caller, apparently his girlfriend, "[m]an, you been taking me to work, you fe[el] me? … [I]f you was sleeping with somebody [who] used the car … we got to figure out who … used the car." (*Id.* at #1216).

At the close of the prosecution's case, Hawkins moved for acquittal, which the judge denied. (*See* Doc. 8, #256). Hawkins then presented an alibi defense. (*See* Doc. 8-6, #1435–36). He called his ex-girlfriend R.P., who had earlier given information to the police that led to Hawkins' arrest. (*See id.* at #1480). On the stand, R.P. testified that she had discovered that Hawkins had not shown her 100% fidelity, and that, when she spoke with police, she wanted to get back at him. (*See id.* at 1479). So she "just told [the police] anything," including that Hawkins had confessed to the shootings. (*Id.* at #1480–81). Her story at trial was that what really happened is that she went to the other woman's house to spy on Hawkins at about 7:45 p.m. on the night in question, saw him arrive some time after that, and saw him stay there for nearly two hours. (*Id.* at #1473–76).

Two other events from the trial are relevant to Hawkins' petition. The first involves the Facebook messages about which Gill testified. When the prosecution sought their admission as an exhibit, before she testified, defense counsel objected that they lacked a proper foundation. (*See* Doc. 8-4, #949–50). The court overruled that objection, though, in effect finding that the prosecution could establish a foundation through Gill's testimony. (*Id.*). But when the prosecutor concluded Gill's direct examination without having done so, the court asked counsel to approach and explained that the records could not be admitted as things stood. (*Id.* at #969–70). The court explained to defense counsel that it would let the state continue Gill's testimony. (*Id.* at #971). The court was concerned that the earlier ruling had confused things, and did not want to prejudice the state's case "by saying, yes, it's admitted and then not admitting" the exhibit. (*Id.* at #972).

Later, at the end of the trial, the parties and the court debated over a complicity instruction. Defense counsel argued that the prosecution did not argue complicity in their case, so the instruction shouldn't be given. (Doc. 8-6, #1666–67). The prosecutor argued that the prosecution did not need to explicitly claim that the defendant was an accomplice if the evidence on its own supported the possible inference. (*Id.* at #1668). The court agreed with the prosecutor, and further found that the evidence supported providing the instruction, citing Hawkins' jail phone calls, the role of gang affiliations in the case, and the possibility that there was more than one person in the car. (*Id.*). Thus, under the "textbook" rule in Ohio that "[i]f you indict somebody, the indictment alone is sufficient to charge that person as a principal or as a

complicitor," the court decided to give the instruction. (*Id.* at #1675; *see also* Doc. 8-7, #1703–05).

## B. Hawkins' Direct Appeal

After his conviction and sentence, Hawkins appealed to Ohio's Tenth District Court of Appeals. (Doc. 8, #151). There, he raised four assignments of error: (1) "[t]he verdicts were not supported by sufficient evidence," (2) "[t]he jury's verdicts were against the manifest weight of the evidence," (3) "[t]he trial court erred when it gave the jury a complicity instruction," and (4) "[t]he trial court erred when it allowed the State to reopen direct questioning of a witness." (Doc. 8, #157).

In support of those assignments of error, Hawkins made several arguments relevant to the present petition. On his first assignment of error Hawkins' appellate brief set out the governing standard: "whether, after viewing the evidence in [the] light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (*Id.* at #167 (quoting *State v. Jenks*, 574 N.E.2d 492, 503 (Ohio 1991))). Then, citing a litany of Ohio cases, but also *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), Hawkins argued that R.P.'s testimony provided him an airtight alibi as to K.W.'s murder and that R.C.'s testimony about the earlier shooting was fabricated. (*Id.* at #167–69).

For his third assignment of error,[4] about the complicity instruction, Hawkins cited Ohio's rule that "the court may instruct the jury on complicity where the

[4] The Court omits detailed discussion of Hawkins' second assignment of error—which raised an Ohio-law argument with no federal counterpart—because none of his three habeas claims are analogous to it.

evidence at trial reasonably supports a finding that the defendant was an aider or abettor." (*Id.* at #173 (citing *State v. Platt*, 2005-Ohio-705, ¶ 19 (10th Dist.))). Hawkins then argued that the state presented no such evidence and characterized the trial court's decision to give the instruction as based on the (erroneous) proposition that testimony about gang affiliation was enough. (*Id.*). Hawkins argued that the state's strenuous efforts to link the shootings to his car amounted to a theory of the case that Hawkins, acting alone, was the only possible shooter, thereby rendering a complicity instruction inappropriate. (*Id.*).

As for his fourth assignment of error, he appears to have argued that the trial court abused its discretion when it unfairly and needlessly saved the state from its own carelessness in not admitting the exhibit. (*Id.* at #179). That error was compounded when the renewed testimony resulted in "a series of particularly damaging statements." (*Id.*). Hawkins cited only two legal authorities related to the merits of this claim, an Ohio statute and an Ohio case. (*Id.* at #176–80); *see also* R.C. § 2945.03; *State v. Payne*, No. 67124, 1995 WL 277098, at *3 (Ohio 8th Dist. May 11, 1995).

The Tenth District affirmed Hawkins's conviction. On his sufficiency of the evidence argument, that court noted that, "[i]n a sufficiency of the evidence analysis, '[t]he court essentially assumes that state's witnesses testified truthfully.'" (*Id.* at #259 (quoting *State v. Davis*, 2019-Ohio-4692, ¶ 38 (10th Dist.))). So R.C.'s identification (as well as others) had to be presumed credible. That testimony, combined with other circumstantial evidence, was sufficient to sustain his conviction

as to R.C.'s shooting. For K.W., the court cited other circumstantial evidence, including the presence of Hawkins's car, his whereabouts being unaccounted for (apart from R.P.'s testimony, which the jury apparently did not credit), and the CSLI establishing that Hawkins could have been present where K.W. was killed. (*Id.* at #260).

The court also rejected Hawkins' argument about the complicity instruction. After citing the now-familiar rule that the indictment need not specify whether a defendant was the principal or an aider or abettor, the court concluded that the trial court did not abuse its discretion because the evidence, as well as Hawkins' "primary defense throughout the trial," which was "to cast doubt on the shooter's identity," supported the instruction. (*Id.* at #264). In short, based on the evidence and arguments, a juror could "potentially conclude that while appellant might not have fired the weapon, he was in the vehicle or involved in aiding the principal offender." (*Id.*).

For Hawkins' argument about reopening Gill's testimony, the court noted that "[a]s set forth in R.C. 2945.10, the trial court controls all the proceedings during a criminal trial and may deviate from the order of proceedings within its discretion." (*Id.* at #265). So Hawkins faced a high bar; he needed to show an abuse of discretion. Raising the bar even higher, the court applied restricted plain error review as Hawkins' counsel had not objected below. (*Id.* at #265–66). Using that framework, the court first held that there was no error to begin with: "the trial court's decision to deviate from the order of proceedings was not unreasonable as it appeared intended

to clarify the testimony and prevent any subsequent evidentiary disputes." (*Id.* at #266). And the court then also held that, while the Facebook messages might have been damaging, they were relatively insignificant compared to the rest of the evidence. So their inclusion did not affect the outcome of the trial, meaning Hawkins couldn't show the third element required to succeed under plain error review, prejudice. (*Id.*).

Because of complications resulting from the COVID-19 pandemic, the Ohio Supreme Court allowed Hawkins to appeal the Tenth District's decision out of time. (*Id.* at #302). To support jurisdiction, Hawkins raised four propositions of law. The first and second were restatements of his sufficiency of the evidence and manifest weight of the evidence arguments, which the Tenth District had rejected. (*Id.* at #305). The third again related to the complicity instruction. This time, however, Hawkins framed the question as whether his "substantial right to due process and a fair trial were violated" when the trial court gave that instruction. (*Id.*). The fourth proposition of law also had a (possibly) new constitutional flavor. It asserted that the court, by allowing the state to reopen its direct examination, had violated Hawkins' "right to due process and a fair trial." (*Id.*).

Despite the change in labelling, the meat of the third argument did not change at all. (*See id.* at #313–15). And the argument on the fourth issue did not change much either, on its merits at least. But Hawkins did add reference to the federal constitutional standard for ineffective assistance of counsel. (*Id.* at #317). Specifically, apparently to support his theory of plain error, Hawkins argued that his trial counsel

was deficient for failing to object to the reopening. (*Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984))). The Ohio Supreme Court declined to consider Hawkins' appeal on April 12, 2022. (*Id.* at #342).

Hawkins did not petition the U.S. Supreme Court for a writ of certiorari. So his conviction became "final" under federal law when the time for seeking that writ expired. *Gonzalez v. Thaler*, 565 U.S. 134, 149–150 (2012); *Jimenez v. Quarterman*, 555 U.S. 113, 120–21 (2009). That was 90 days after the Ohio Supreme Court's declination, so July 11, 2022. *See* Sup. Ct. R. 13.1, 13.3.

### C. Hawkins' Federal Habeas Petition

That brings us, at long last, to the habeas petition. Hawkins filed it on April 10, 2023, roughly nine months later after his conviction became final, so this action is timely. 28 U.S.C. § 2244(d)(1)(A). The petition is fully briefed, and the Magistrate Judge has filed her R&R.

Hawkins' habeas petition raises three grounds for relief, all of which should sound familiar in light of the recounting above: (1) there was insufficient evidence to support the conviction, (Doc. 1, #5), (2) the trial court violated his due process rights by giving a jury instruction not supported by the evidence, (*id.* at #7), and (3) the trial court violated his rights to a fair trial and due process by permitting the state to reopen its direct examination of Amber Gill in order to authenticate the Facebook records, (*id.* at #8).

The R&R recommends that the Court dismiss each claim. The Magistrate Judge concluded that Hawkins' first claim fails on the merits. (Doc. 17, #1873). For

the second two claims, the Magistrate Judge concluded (1) that, despite sounding similar to his corresponding state court claims, neither could be considered on their merits in federal court because Hawkins did not raise them as federal constitutional issues in the state court proceedings, thus procedurally defaulting them, and (2) that even if the Court could consider the merits, both grounds failed. (*Id.* at #1873–76).

Hawkins timely objected to the Magistrate Judge's recommendations. (Doc. 20). In particular, he objects to the Magistrate Judge's determinations that (1) his sufficiency of the evidence claim fails, (*id.* at #1889), (2) he did not present his second ground for relief to the Ohio courts, (*id.* at #1890), (3) his second ground failed on the merits, (*id.* at #1890–91), (4) he did not present his third ground for relief to the Ohio courts, (*id.* at #1891–92), and (5) his third ground failed on the merits, (*id.*). The matter is now ripe.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 72(b)(3), "district courts review an R&R de novo after a party files a timely objection." *Bates v. Ohio Dep't of Rehab. & Corr.*, No. 1:22-cv-337, 2023 WL 4348835, at *1 (S.D. Ohio July 5, 2023). But that review extends only to "any portion to which a proper objection was made." *Id.* (quotation omitted). To properly object, "a litigant must identify, with sufficient clarity, each issue in the [R&R] to which he objects." *Finnell v. Warden, Lebanon Corr. Inst.*, No. 1:17-cv-268, 2025 WL 961880, at *4 (S.D. Ohio Mar. 31, 2025) (citing *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995)). For unobjected portions of an R&R, by contrast, the Court need only "satisfy itself that there is no clear error on the face of the record in

order to accept the recommendation." *Redmon v. Noel*, No. 1:21-cv-445, 2021 WL 4771259, at *1 (S.D. Ohio Oct. 13, 2021) (collecting cases) (quoting Fed. R. Civ. P. 72(b) advisory committee's note (1983)).

In Hawkins' objection, he specifically identifies each of the Magistrate Judge's conclusions and makes arguments for why each was incorrect. (*See* Doc. 20, #1889–92). True, Hawkins' analysis could benefit from greater explication. But the Court cannot say that the objection did not "enable [the Court] to discern those issues that are dispositive and contentious," which is all that is required here. *Miller*, 50 F.3d at 380. The Court thus reviews the R&R de novo for each of Hawkins' claims.

## LAW & ANALYSIS

Hawkins advances three claims he believes entitle him to habeas relief. First, he argues that the state did not present sufficient evidence to sustain his conviction, violating his due process rights. (Doc. 16, #1843). Second, he argues that the trial court's instruction on complicity unfairly prejudiced him, violating his right to due process. (*Id.* at #1840–41). And third, he argues that the trial court violated his rights to due process and a fair trial when it permitted the state to reopen its case-in-chief to authenticate an exhibit. (*Id.* at #1841, 1842).

The Magistrate Judge did not err in recommending that the Court dismiss Hawkins' petition. Hawkins procedurally defaulted his second and third claims because he did not properly raise them in state court and no avenue remains for him to do so now. And his first claim fails on its merits. The Court begins with Hawkins'

second and third claims—those about the complicity instruction and the trial court's permitting the state to reopen its direct examination of one of its witnesses.

### A. Hawkins Procedurally Defaulted His Second and Third Claims.

Before a petitioner can present the merits of his claim, he must overcome the rather unforgiving rules on procedural default. That doctrine bars federal habeas courts from reaching any claims that the state courts elected not to hear due to "the prisoner … fail[ing] to meet a state procedural requirement." *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991). So a petitioner cannot succeed on a claim in habeas where (1) "there is a state procedural rule" that applies to the claim, (2) the state court "actually enforced the state procedural sanction," and (3) the state procedural ruling would be an "adequate and independent state ground" on direct review in the Supreme Court. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986) (quotations omitted); *see also Wainwright v. Sykes*, 433 U.S. 72, 81, 86–87 (1977). In that situation, the petitioner has two options, but neither is easy. He could try to show that "failure to review his federal claim will result in a fundamental miscarriage of justice," *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000), but such cases are "rare," *see House v. Bell*, 547 U.S. 518, 554 (2006). The only other route requires the petitioner to show that there was "'cause' for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error," the so-called cause-and-prejudice standard. *Maupin*, 785 F.2d at 138 (quoting *Sykes*, 433 U.S. at 87).

An added wrinkle is that there are two kinds of procedural defaults. The doctrine's heartland is cases where a state court actually invoked the petitioner's non-compliance with a procedural rule—say, a contemporaneous objection requirement—to hold that the petitioner could not raise the underlying claim. But a claim that an applicant never even attempted to raise in state court (i.e., a claim that would typically barred by the "exhaust[ion]" requirement, *see* 28 U.S.C. § 2254(b)) is deemed both exhausted and defaulted if the applicant has no "available procedure" to now raise the "question presented" in state court. *See id.* § 2254(c); *Coleman*, 501 U.S. at 735 n.1. So, with that background in place, the Court can turn to the specifics of Hawkins' claims.

### 1. The Complicity Instruction Claim

The Magistrate Judge concluded that the Court cannot reach Hawkins' claim that the trial court's instruction on complicity violated his right to due process of law. That was not error. Hawkins never presented this claim in state court, at least not as a federal constitutional claim, and he cannot do so now.

To preserve a claim for federal habeas review, a petitioner must "fairly present[]" that claim to state courts. *Franklin v. Rose*, 811 F.2d 322, 324–25 (6th Cir. 1987). To do that, the defendant must "assert[] both [its] factual and legal basis … to the state courts." *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). And prisoners in state custody, as a general rule, must show that their conviction violated "the Constitution … of the United States." 28 U.S.C. § 2241(c)(3); *Reed v. Farley*, 512 U.S. 339, 348–49, 356–57 (1994). So in addition to identifying the facts underlying

his claim, Hawkins must have "present[ed] his claim to the state courts as a federal constitutional issue." *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984). "General allegations of the denial of rights to a 'fair trial' and 'due process' do not 'fairly present' claims that specific constitutional rights were violated." *McMeans*, 228 F.3d at 681 (quoting *Petrucelli v. Coombe*, 735 F.2d 684, 688–89 (2d Cir. 1984)).

In ambiguous cases, courts in this Circuit look for at least four actions that can indicate a defendant squarely presented a federal claim to the state court: (1) "reliance upon federal cases employing constitutional analysis," (2) "reliance upon state cases employing federal constitutional analysis," (3) "phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right," and (4) "alleging facts well within the mainstream of constitutional law." *Id.* at 681 (citing *Franklin*, 811 F.2d at 326).

As the Magistrate Judge pointed out, "Hawkins's appellate brief took none of these steps" with respect to his second ground for habeas relief. (Doc. 17, #1863). As discussed above, instead of raising constitutional concerns, he framed the issue as "[w]hether the trial court erred when it instructed the jury on complicity where the evidence at trial did not reasonably support a finding that the defendant was an aider or abettor." (Doc. 8, #158). The governing standard he cited on that question comes from an Ohio case. (*Id.* at #172–73 (citing *Platt*, 2005-Ohio-705, ¶ 58)). And that case's analysis relied exclusively on Ohio cases and statutes. *See Platt*, 2005-Ohio-705, ¶¶ 58–63. The rest of his argument in the appeals court also focused exclusively on

state law. (*See* Doc. 8, #173–76). In light of that, Hawkins did not fairly present a constitutional due process claim based on the complicity instruction.

Hawkins presses a couple of counters to that, but neither works. First, he says that, to show that a jury instruction warrants reversal in Ohio, a defendant must show that it "misled the jury in a matter materially affecting the complaining party's substantial rights." (Doc. 20, #1890 (quoting *Platt*, 2005-Ohio-705, ¶ 58)). And Hawkins correctly notes that he pointed this out in his Tenth District brief. (Doc. 8, #172–73). Moreover, he says, the rights to due process and a fair trial are substantial rights. (*See* Doc. 16, #1842). So, he says, he did press his constitutional rights in challenging this error. But that is not the case. To squarely present a federal due process or fair trial claim to the Ohio Court of Appeals he needed to explain that *those* rights—i.e, the rights to due process and a fair trial—were the substantial rights on which he was relying. Hawkins' appellate brief says nothing of the sort. The brief instead focused exclusively on the Ohio-law proposition, a proposition not found in or arising from the Constitution, that the trial court erred in giving the jury instruction because the instruction was not supported by the evidence. (Doc. 8, #172–76). In short, the error he pressed was a state-law error.

Separately, Hawkins argues that, even if he didn't present the claim to the Tenth District, he nonetheless exhausted this claim, as a constitutional claim, at the Ohio Supreme Court. And he is correct that he identified his "substantial right to due process and a fair trial" in his third proposition of law there. (*Id.* at #313). But, even crediting the dubious proposition that this "presented" the issue to the Ohio Supreme

Court, it still would not save this claim for two reasons. First, "[f]or a claim to be reviewable at the federal level, [it] must [have been] fairly presented at every stage of the state appellate process." *Wagner v. Smith*, 581 F.3d 410, 418 (6th Cir. 2009). Second, the Ohio Supreme Court will not "consider a claim of error which was not raised and was not considered or decided" by the court below. *State v. Jester*, 512 N.E.2d 962, 970 (Ohio 1987); *see also State v. Rhines*, 2011-Ohio-3615, ¶ 18 (2d Dist.). So "claims raised for the first time in the Ohio Supreme Court are procedurally defaulted." *Moore v. Edwards*, No. 23-3844, 2024 WL 1636585, at *3 (6th Cir. Apr. 1, 2024) (citing *Eskridge v. Konteh*, 88 F. App'x 831, 837–38 & n.4 (6th Cir. 2004)). In short, he did not "fairly present" the claim to state court, and thus cannot (at least cannot yet) present it in habeas here, as he failed to exhaust it in state court.

But that gives rise to a second problem—Hawkins also cannot raise this claim before the Ohio courts anymore. True, Ohio generally permits defendants to collaterally attack their convictions. *See* R.C. § 2953.21(A)(1)(a)(i). And if that procedure remained open to Hawkins, the Court would dismiss his petition on exhaustion grounds. *See Rose v. Lundy*, 455 U.S. 509, 522 (1982). But Ohio courts may not entertain a state habeas petition filed more than a year after "the trial transcript is filed in the court of appeals." R.C. § 2953.21(A)(2)(a). While that rule has two exceptions, Hawkins does not meet either. *See id.* § 2953.23(A). Further, Ohio's res judicata doctrine bars collateral litigation of claims that were available on direct appeal but not made, and that is an independent and adequate state ground which

also prevents federal habeas review. *See Lundgren v. Mitchell*, 440 F.3d 754, 765 & n.2 (6th Cir. 2006); *Seymour v. Walker*, 224 F.3d 542, 555 (6th Cir. 2000).

Finally Hawkins cannot show the cause and prejudice necessary to excuse his procedural default. To demonstrate cause for failing to comply with a state procedural rule, a petitioner "ordinarily" must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). The prejudice inquiry, on the other hand, examines the impact of the claimed constitutional error on the petitioner's conviction, requiring some showing that the result of the proceeding would have been different. *See Reed v. Ross*, 468 U.S. 1, 12 (1984); *Banks v. Dretke*, 540 U.S. 668, 703 (2004).

Hawkins offers no reason why he could not have properly raised this claim in state court, so he has not shown cause. He at least takes a shot at prejudice, asserting that the complicity instruction affected his "substantial right[s]." (Doc. 16, #1842). But even assuming that giving the complicity instruction violated the constitution, the Court still agrees with the Magistrate Judge that Hawkins did not suffer actual prejudice here. (*See* Doc. 17, #1865). The array of interlocking circumstantial evidence against Hawkins outlined above was overwhelming. There is no reason to believe that giving the jury the complicity instruction created a "reasonable probability of a different result" in Hawkins' trial. *Banks*, 540 U.S. at 703. For that same reason, any implicit argument from Hawkins that enforcing his procedural default would lead to a miscarriage of justice is also meritless. *See Carpenter*, 529 U.S. at 451. So, while he must show both cause and prejudice, he has in fact shown neither.

### 2. Reopening Direct Examination

Applying that same framework, the Magistrate Judge was also correct that Hawkins defaulted his claim that, by permitting the prosecutor to reopen his direct examination of Gill, the trial court violated his federal constitutional rights. (Doc. 17, #1866).

Start with whether Hawkins exhausted this claim in state court. As a reminder, Hawkins petitions for habeas relief here because, he argues, the state trial court violated his rights to due process and a fair trial by allowing the state to reopen testimony to authenticate evidence. (Doc. 1, #8). At trial, Hawkins' counsel did not object to reopening Gill's direct testimony. (*See* Doc. 8-4, #970–72). On appeal, Hawkins argued that the trial court, while empowered with discretion to "control all proceedings during a criminal trial," failed to heed *the Ohio rule* requiring it to "limit the introduction of evidence and the argument of counsel to relevant and material matters with a view to expeditious and effective ascertainment of the truth regarding the matters in issue." (Doc. 8, #176 (quoting R.C. § 2945.03)). The entirety of Hawkins' appellate argument applying that standard was directed at distinguishing an Ohio appellate case finding no abuse of discretion where the state reopened its direct examination of a child witness. (*Id.* at #179–80); *see also Payne*, 1995 WL 277098, at *3.

The reasons set forth above for why the Court concludes that Hawkins defaulted his complicity-instruction claim would almost certainly apply with equal force to this claim. As with his other claim of error, Hawkins tacked a conclusory statement about his rights to due process and a fair trial onto his Ohio Supreme Court

brief for this claim. (*See* Doc. 8, #315–18). But as noted above, that is not enough to meet the "fairly presented" requirement.

That said, the Court need not mine the federal- vs. state-law nature of Hawkins' arguments during his state appeal in addressing his present claim in habeas. That is because, whatever the nature of Hawkins' arguments on appeal, he defaulted this claim even earlier—when his counsel failed to object at trial. "[A]n Ohio court's enforcement of the contemporaneous-objection rule is 'an independent and adequate state ground of decision' sufficient to bar habeas relief." *Hand v. Houk*, 871 F.3d 390, 417 (6th Cir. 2017) (quoting *Wogenstahl v. Mitchell*, 668 F.3d 307, 336 (6th Cir. 2012)). And the Tenth District applied the rule here by confining its review to the question of whether the trial court committed plain error. (Doc. 8, #265–66). Performing that limited review "does not constitute a waiver of the state's procedural default rules." *Keith v. Mitchell*, 455 F.3d 662, 674 (6th Cir. 2006) (first citing *Cooey v. Coyle*, 289 F.3d 882, 897 (6th Cir. 2002); and then *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000)).

As with the claim previously addressed, Hawkins also cannot show cause and prejudice to excuse this default. Indeed, he does not even argue cause here, beyond raising the possibility that his trial counsel was ineffective by failing to object. (Doc. 8, #317). But that won't work as cause; "an ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted." *Carpenter*, 529 U.S. at 453. And that happened here. Hawkins' first chance to raise the ineffective-assistance claim was at the Tenth District. He had

different appellate counsel than he had at trial, and all the facts that might support that claim were available. (*Compare* Doc. 8, #147; *with* Doc. 8, #180–81). Further, going one layer deeper, he never raised an ineffective-assistance claim about his appellate counsel, and any such claim is now time-barred. *See* Ohio App. R. 26(B)(1); *Scuba v. Brigano*, 527 F.3d 479, 488 (6th Cir. 2007).

Prejudice is also absent. As described above, all the trial court's decision led to was admission of Hawkins' Facebook records and personal messages. Those communications were by no means the centerpiece of the prosecution's case. And, as the Tenth District pointed out, Hawkins' trial counsel had a full opportunity to cross-examine Gill about the messages. So Hawkins cannot overcome the default even assuming the trial court acted improperly by admitting the evidence.

**B. Hawkins' Sufficiency of the Evidence Claim Fails on the Merits.**

Hawkins' first ground for habeas relief, unlike the second two, at least gets off the launch pad. Hawkins' first assignment of error to the Tenth District argued that the evidence adduced at trial was insufficient to support the guilty verdict. (Doc. 8, #167). And Hawkins, in arguing that issue, presented his federal and state claims in one stroke. That is because Ohio adopted its sufficiency of the evidence standard from the Supreme Court's analysis of the federal Due Process Clause in *Jackson*. *See Jenks*, 574 N.E.2d at 503 ("[T]he inquiry is … whether any reasonable trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.") (citing *Jackson*, 443 U.S. at 319). Hawkins cited this standard as well as both cases. (Doc. 8, #167). So he did not default this claim.

Every silver lining has its dark cloud. Properly presenting a claim to a state court usually means the state court decided that claim on its merits, and that is what happened here. (*See* Doc. 8, #257–61). But in a habeas action under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), that creates a formidable obstacle. The Court cannot grant relief based on claims "adjudicated on the merits in state court" unless the petitioner shows that one of the exceptions outlined in 28 U.S.C. § 2254(d) applies. *Johnson v. Bobby*, 170 F.4th 523, 530–31 (6th Cir. 2026) (citing *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)). That is, a federal court cannot issue a writ of habeas corpus unless the state court decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Harrington v. Richter*, 562 U.S. 86, 97–98 (2011).

Putting everything together, Hawkins faces a daunting task. He must show that the Tenth District's decision that some "rational trier of fact *could* have found the essential elements of the crime beyond a reasonable doubt," *Jackson*, 443 U.S. at 319 (emphasis added), meets the strict conditions of § 2254(d). As the Sixth Circuit has recognized, "*Jackson* and AEDPA's two layers of deference dictate that 'a federal court's review of a state-court conviction for sufficiency of the evidence is very limited.'" *Thompson v. Skipper*, 981 F.3d 476, 479 (6th Cir. 2020) (quoting *Tackett v. Trierweiler*, 956 F.3d 358, 367 (6th Cir. 2020). The Court is "bound by two layers of

deference to groups who might view facts differently than [it] would." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).

Here, considering the evidence, the Court cannot say that "it is so obvious" that Hawkins' *Jackson* claim should have succeeded "that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 572 U.S. 415, 427 (2014) (quoting *Richter*, 562 U.S. at 103). Start with his felonious assault conviction—for R.C.'s shooting. The state court noted that, shortly after the shooting, R.C. "described the shooter … as a light-skinned African-American male with a beard and glasses." (Doc. 8, #259). And, while he could not immediately identify the shooter, he knew it was Hawkins after seeing some photos. (*Id.*). Finally, R.C. identified Hawkins in open court. (*Id.*). Hawkins argues that R.C. must have been lying at trial because he would have been able to identify him the first time if at all. (Doc. 16, #1845–46). But, as the Magistrate Judge noted, nobody could fault the Tenth District for deferring to the jury's credibility determination. (Doc. 17, #1871). Besides, that court also relied on the state's "substantial circumstantial evidence." (Doc. 8, #260). Multiple witnesses testified to a car matching descriptions of Hawkins' car driving through the neighborhood. (*Id.*). One of these witnesses merely heard shots soon after encountering the car; but the other actually saw the shooting and gave an account consistent with R.C.'s. (*Id.*). Accounting for the later evidence about Hawkins' ownership and possession of the car—as well as the shell casings and his statements—the Tenth District found there was "sufficient evidence" to convict Hawkins. (*Id.* at #260–61).

It would be hard to call that "unreasonable." 28 U.S.C. § 2254(d). Under *Jackson*, neither the Tenth District nor this Court can "reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." *Konteh*, 567 F.3d at 205 (citing *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993). So, crediting the Tenth District's conclusions about the jury's apparent acceptance of R.C.'s testimony and consideration of the other evidence, the Court must agree with the Magistrate Judge that Hawkins' attack on the felonious assault conviction fails.

The story is much the same for his aggravated-murder conviction. The state court reviewed the interlocking pieces of circumstantial evidence here: a witness to the shooting testifying that she had seen the same black vehicle earlier in the day, surveillance video showing the vehicle, employment and CSLI records showing Hawkins could easily have been at the scene. (Doc. 8, #260). Adding to that the additional circumstantial evidence discussed above, the court again found that a reasonable juror could agree that Hawkins committed the crime. (*Id.* at #261).

Hawkins relies heavily on the testimony of his ex-girlfriend, R.P. (Doc. 1, #5). But that does not suffice the meet Hawkins' heavy burden here. In the first place, judgments about a witness's credibility belong to the jury. *Konteh*, 567 F.3d at 205. But, taking even a short peek at R.P.'s testimony, the Court can see why the Tenth District thought it was rational, considering all the other evidence, to disregard it. R.P. had provided the police with much of the information they used to arrest Hawkins, though at trial she claimed to have been lying. (Doc. 8-6, #1486). And she

admitted she had never provided officers with the corrected story in the two years between the shootings and the trial. (*Id.* at #1533–34).

The Court must deny relief even if it concludes "that a rational trier of fact could *not* have found [Hawkins] guilty beyond a reasonable doubt," so long as the state court's contrary determination on that question was not "unreasonable." *Konteh*, 567 F.3d at 205. With that standard in mind, the Magistrate Judge concluded that Hawkins' claim failed. The Court cannot disagree.

* * *

Hawkins procedurally defaulted his second and third grounds for habeas relief because he did not fairly present them in state court. As a result, the Court need not reach the merits of those claims. And Hawkins' sufficiency-of-the-evidence claim fails on the merits because the state court's conclusion that some rational trier of fact could find Hawkins guilty was not unreasonable. The Magistrate Judge's conclusions on all of these claims were correct.

## CONCLUSION

The Court **ADOPTS** the R&R (Doc. 17) and **OVERRULES** Hawkins' objections (Doc. 20). Accordingly, the Court **DISMISSES** Hawkins' Petition for a Writ of Habeas Corpus (Doc. 1) **WITH PREJUDICE**. And, because the Court finds that reasonable jurists would not disagree with these conclusions, the Court **DENIES** Hawkins a certificate of appealability and **CERTIFIES** that any appeal of this Opinion and Order would be objectively frivolous. The Clerk is **DIRECTED** to **ENTER JUDGMENT** for the Warden and **TERMINATE** this case on the Court's docket.

**SO ORDERED.**

November 3, 2026
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**